UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA
ASHEVILLE DIVISION
1:18-cv-25-MOC-WCM

| | | |
|---|---|---|
| EDGAR ROBERTS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | **ORDER** |
| | ) | |
| YALE SECURITY, INC. D/B/A/ NORTON DOOR CONTROLS, | ) ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**THIS MATTER** comes before the Court on a Motion for Summary Judgment by Defendant Yale Security, Inc. (Doc. No. 16). Plaintiff Edgar Roberts is represented by Geraldine Sumter of the law firm of Ferguson, Chambers & Sumter, P.A. Defendant Yale Security is represented by Kelly Hughes of the law firm of Ogletree, Deakins, Nash, Smoak & Stewart, P.C.

**I.    BACKGROUND**

   **A.    Procedural Background**

Plaintiff Edgar Roberts filed this action on February 5, 2018, bringing a race discrimination action against his former employer Defendant Yale Security, Inc., pursuant to 42 U.S.C. § 1981.[1] Defendant filed the pending summary judgment motion on March 1, 2019. (Doc. No. 16). On March 14, 2019, Plaintiff filed a motion for extension of time to file a

---

[1] In March 2014, Plaintiff filed an administrative charge with the Equal Employment Opportunity Commission ("EEOC"). (Doc. No. 16-5 at 3, Pl. Dep. Ex. 7). The EEOC issued Plaintiff a Dismissal and Right-to-Sue notice in August 2014. (Doc. No. 16-5 at 3, Pl. Dep. Ex. 8).

1

response to the summary judgment motion. (Doc. No. 18). On March 20, 2019, this Court granted Plaintiff's motion, giving Plaintiff until April 12, 2019, to file the response. (Doc. No. 19). Plaintiff has not filed a response and the time to do so has passed.[2] Thus, this matter is ripe for disposition.

### B. Factual Background

#### 1. Plaintiff's Allegations in his Complaint

Because Plaintiff has not responded to the summary judgment motion with his own summary judgment evidence, the Court has before it on summary judgment only the allegations made in his Complaint. Plaintiff alleges in the Complaint that Defendant hired him in September 2007 as a design/quality engineer. Plaintiff worked in a department in which he was the only African-American and one of only two African-American engineers in the company in Monroe, North Carolina.

Plaintiff alleges that he performed his work in a satisfactory manner. He alleges that on February 10, 2014, he was advised that he was subject to a layoff. Plaintiff further alleges that Defendant retained white employees in Plaintiff's department whose work performance was not equal to his and who had caused substantial expenditures of money by Defendant without producing a suitable project. Finally, Plaintiff alleges that no other person in Plaintiff's department was subject to a layoff, and that all other employees retained their positions. Plaintiff alleges that, in being laid off, he was subjected to race discrimination, in violation of 42 U.S.C. § 1981.

---

[2] Because Plaintiff did not file a response to the summary judgment motion, he is deemed to have abandoned his claims. See Crosby v. Gastonia, 635 F.3d 634, 637 n.3 (4th Cir. 2011). In an abundance of caution, however, the Court will address the merits of Plaintiff's claims.

**2.     Defendant's Summary Judgment Materials**

Defendant Yale Security's summary judgment evidence shows that Defendant hired Plaintiff in September 2007. (Doc No. 16-2, Def. Ex. A: Pl. Dep. at 23:11 to 23:12). Plaintiff worked for a business unit of Yale Security, Norton Door Controls ("Norton"), at a facility in Monroe, North Carolina.[3] (Doc. No. 16-3, Def. Ex. B: Dietrich Decl. at ¶¶ 2-3; Pl. Dep. 30:21 to 30:23). Yale Security offered a broad portfolio of door hardware and locks for residential and commercial uses. (Doc. No. 16-4, Def. Ex. C: Sejourne Decl. at ¶ 3). Norton's business was (and is) specifically dedicated to the design, manufacture, and distribution of door closers. (Id.). Following a corporate reorganization in 2018 that split the lock businesses and accessories/door controls businesses into different entities and operational subgroups, Yale Security changed its corporate name to ASSA ABLOY Accessories and Door Controls Group, Inc. and retained the Norton business. (Id.).

During his employment with Norton, Plaintiff was a Design/Quality Engineer. (Pl. Dep. 27:24 to 28:1). As a Design/Quality Engineer, Plaintiff initially performed design engineering work in the purchasing profit center, while also performing quality engineering work in the quality profit center. (Id. at 28:2 to 28:9). Joe Viola was Plaintiff's manager during this time, and Plaintiff got along "very well" with him. (Id. at 28:18 to 28:22, 36:4 to 36:10).

In or around 2011, Brian Norman became Plaintiff's manager. (Pl. Dep. 36:11 to 36:20).

---

[3] Defendant notes that, at the time of his hire, Plaintiff received a copy of Norton's handbook. (Id. at 32:8 to 32:25). It contained a comprehensive equal employment opportunity policy which, among other things, provides that employment decisions, including those with respect to termination and layoff, will be made without regard to race. (Sejourne Decl., Ex. A). Plaintiff acknowledged receipt of the handbook and the fact that he was an at-will employee and, therefore, could be separated from employment with or without notice or cause for any lawful reason. (Pl. Dep. 32:15 to 32:22; Doc. No. 16-5, Def. Ex. 5).

At the time, according to Plaintiff in his deposition, all engineers were pulled from their individual profit centers and combined under one department reporting to Mr. Norman. (Id. at 37:3 to 37:8). Mr. Norman eventually left the company and, in June 2012, Kurt Dietrich became the Engineering Manager. (Id. at 41:1 to 41:8; Dietrich Decl. ¶¶ 2-3). In this role, Mr. Dietrich managed the Research and Development ("R&D") team, composed solely of engineers (including Plaintiff), and the Technical Product Support ("TPS") team. (Dietrich Decl. at ¶ 3). Mr. Dietrich was Plaintiff's manager until Plaintiff's separation in February 2014. (Id. at ¶ 2; Pl. Dep. 100:3 to 100:16). Plaintiff describes his relationship with Mr. Dietrich as "excellent." (Pl. Dep. 42:7 to 42:9). When asked during his deposition to evaluate his own performance, Plaintiff testified that he "never" made any mistakes—either at Norton or at any other company for which he has ever worked. (Id. at 88:7 to 88:18).

At the time of the February 2014 layoff, Yale Security (including its business unit Norton) fell beneath the Architectural Hardware Group ("AHG"), an operational subgroup of the ASSA ABLOY Group's Americas division. (Sejourne Decl. at ¶ 2). At the time, Eric Sejourne was AHG's Vice President of Operational Excellence and Doug Millikan was AHG's President. (Id. at ¶ 3). Mr. Millikan passed away in March 2015. (Id. at ¶ 4 n.1). By virtue of their roles and the organizational structure, both Mr. Sejourne and Mr. Millikan had responsibility for Norton. (Id. at ¶¶ 2-3).

In or around January 2014, Mr. Sejourne became aware that ASSA ABLOY's global headquarters issued a directive to reduce costs at the Americas divisional level. (Id. at ¶ 5). This directive was issued in response to slowing demand and, in turn, declining income and weakening profit. (Id.). As a result, Mr. Millikan and the other subgroup Presidents within the Americas division were tasked with reducing costs through downsizing and other cost-saving

4

measures. (Id.). In addition, around the time of this mandate, Norton discovered that it had made an accounting error, which resulted in the business having less money than expected and further contributed to the need to reduce costs. (Id.).

In response to this directive, Mr. Millikan requested that Mr. Sejourne conduct what is called a "workout session" with respect to salaried employees, as well as factory indirect employees, of the Norton business unit. (Id. at ¶ 6). Plaintiff was a salaried employee of Norton. (Dietrich Decl. at ¶ 3). The workout session is designed to evaluate the organization holistically and to determine whether greater organizational efficiencies can be achieved, including through potential labor reduction. (Id. at ¶ 6).

In advance of the workout session, Norton managers, including Mr. Dietrich, were directed to rate their team members based on their assessment of the employees' performance, as well as to identify projects on which they were working. (Id. at ¶ 7; Dietrich Decl. at ¶ 6). With respect to the assessment, the managers were directed to assign each team member an "A," "B," or "C" rating. (Id.). This rating was then affixed to a card containing each employee's name, title, picture, and a listing of their current assigned work/responsibilities. (Sejourne Decl. at ¶ 7). At the workout session, which was held off site in a hotel conference room, these cards were used to recreate a large organizational chart, which was affixed to the conference room wall. (Id.).

Consistent with the directive, Mr. Dietrich identified the projects that each of his direct reports was working on at the time, including all members of the R&D team. (Dietrich Decl. at ¶ 7). In addition to identifying the projects of each employee, he assigned them an "A," "B," or "C" rating based on his assessment of each associate's performance. (Id. at ¶ 8). At the time, Mr. Dietrich did not know whether any of the employees he managed would be reduced and, if

5

so, how many. (Id. at ¶ 11).

As of January 2014, the R&D team was composed of six employees, all of whom were engineers with varying skill sets. (Id. at ¶ 3). As a result of Mr. Dietrich's assessment, he determined that one engineer should receive an "A" rating, three engineers should receive "B" ratings, and two engineers should receive "C" ratings.[4] (Id. at ¶ 8). Plaintiff was one of the two engineers to receive a "C" rating. (Id. at ¶ 9). He received this rating based on Mr. Dietrich's determination that he was not committed to moving projects at a pace for quick development and was unwilling to perform tasks that were not specifically assigned to him. (Id.). In addition, based on his assessment, Mr. Dietrich believed that Plaintiff was difficult to work with and struggled in his interactions with suppliers. (Id.). Mr. Dietrich personally observed that Plaintiff was inflexible and reluctant to accept feedback or ideas from others. (Id.).

Mr. Dietrich also gave another engineer a "C" rating. (Id. at ¶ 10). In Mr. Dietrich's assessment, this other engineer, who is Caucasian, was resistant to change and required coaching to adapt to new structures and processes. (Id.). While Mr. Dietrich believed that he was showing a willingness to improve, Mr. Dietrich's assessment at the time was that a "C" rating was appropriate for this other engineer as well. (Id.). Mr. Sejourne facilitated the off-site workout session in relation to salaried and factory indirect employees working for Norton with the assistance of Norton's then General Manager, Dave Roberts,[5] and Mr. Millikan. (Sejourne Decl. at ¶ 7). During the workout session, each participating manager presented their team

---

[4] Defendant states that it has omitted these persons' names to preserve the privacy of individuals not parties to this lawsuit and, consistent with the parties' protective order, (Doc. No. 14), to protect them from disclosure of confidential information, including sensitive employment and performance information.

[5] For clarity, although Plaintiff's last name is "Roberts," Dave Roberts will be referred to as "Mr. Roberts." Plaintiff will continue to be referred to as "Plaintiff."

members individually. (Id. at ¶ 8). These presentations included the managers' employee ratings and the reasoning behind those ratings, as well as the projects on which their employees were working. (Id.). At times, other managers provided input, including their own observations regarding a team member's performance or skills. (Id.). In addition, throughout the day, workout leadership and the managers had ongoing discussions regarding whether there were organizational redundancies and whether there were opportunities to consolidate and reduce waste within the departments. (Id.).

When Mr. Dietrich presented the R&D team, no manager present disagreed with the appropriateness of the assigned "C" rating for Plaintiff. (Dietrich Decl. at ¶ 11). There was, however, some disagreement regarding the ratings Mr. Dietrich assigned to a couple of individuals, including the engineer other than Plaintiff who received a "C." (Id.). With respect to that engineer, at least two managers, including Jeff Duke, believed that he should have received a "B" rating instead of a "C." (Id.). Mr. Duke is African-American. (Id.). In addition, at least one manager questioned Mr. Dietrich's rating of the engineer he had rated "A," indicating that Mr. Dietrich should consider changing him to a "B." (Id.). Ultimately, Mr. Dietrich did not change any of the ratings that he had originally assigned to his team members. (Id.).

At the end of the day, and after presentation by each manager of their team members and discussion of potential organizational redundancies, Mr. Sejourne, Mr. Millikan, and Mr. Roberts made the decision to reduce certain positions at Norton. (Sejourne Decl. at ¶ 9). This included the decision to eliminate one engineer from the R&D team based on the assessment that Norton could meet current and anticipated future operational and business demands with five instead of six engineers on the team. (Id.). Mr. Dietrich was then asked who could be eliminated from the

7

R&D team with the least overall effect on the team's performance and productivity. (Id. at ¶ 10; Dietrich Decl. at ¶ 12). To reach a determination, he considered the team's outstanding projects, including their urgencies and intricacies, and how they could most effectively be absorbed by the team. (Dietrich Decl. at ¶ 12). Ultimately, Mr. Dietrich recommended Plaintiff for reduction based on his determination that Plaintiff's current projects could be easily and effectively assumed by the remaining R&D engineers, but Plaintiff could not easily assume the projects of the other team members. (Id.). Though one other engineer also received a "C" rating, that engineer was handling electromechanical work, which Plaintiff admitted in his deposition that he did not have the knowledge or skill to assume or perform. (Id.; Pl. Dep. 217:10 to 217:14). According to Defendant, neither the decision to assign Plaintiff a "C" rating, nor the decision to select him for the layoff, were related to Plaintiff's race. (Dietrich Decl. at ¶ 12; Sejourne Decl. at ¶ 11).

Plaintiff was informed of the decision to separate his employment due to downsizing on February 10, 2014. (Pl. Dep. 100:12 to 100:16). He testified that he was not told why he was selected for separation, he does not know who selected him for separation, and he does not know the process that was used to select employees for separation. (Id. at 104:11 to 104:24, 115:1 to 115:4). The five other employees selected for reduction as part of the workout process described above and separated on February 10, 2014, were Caucasian. (Sejourne Decl. at ¶ 12). While other African-American employees were evaluated as part of the workout process, including two African-American engineers in other departments, no other African-American employees were separated as part of the downsizing at Norton affecting Plaintiff's employment. (Id.).

Plaintiff admitted during his deposition that he had never heard any of the individuals involved in the decision to select Plaintiff for the layoff (i.e., Mr. Sejourne, Mr. Millikan, Mr.

8

Roberts, and Mr. Dietrich) make any race-based comments or statements. (Pl. Dep. 49:13 to 50:21, 231:22 to 231:24, 232:14 to 231:16). Plaintiff further admitted that he does not know (and, therefore, has no evidence of) whether Mr. Roberts, Mr. Sejourne, Mr. Millikan, or Mr. Dietrich harbor/harbored any kind of race-based bias against him. (Id. at 50:18 to 50:25, 97:18 to 97:25; 231:17 to 231:21, 232:17 to 232:19). Following his layoff from Norton in February 2014, Plaintiff's position did not remain open, nor was he replaced during Mr. Dietrich's tenure as Engineering Manager. (Dietrich Decl. at ¶ 17).

## II. STANDARD OF REVIEW

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A factual dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). When determining whether a genuine issue has been raised, the court must construe all inferences and ambiguities against the movant and in favor of the non-moving party. United States v. Diebold, Inc., 369 U.S. 654, 655 (1962).

The party seeking summary judgment has the initial burden of demonstrating that there is no genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Once the movant has made this threshold demonstration, the non-moving party, to survive the motion for summary judgment, may not rest on the allegations averred in his pleadings. Id. at 324. Rather, the non-moving party must demonstrate specific, material facts exist that give rise to a genuine issue. Id. Under this standard, the existence of a mere scintilla of evidence in support of the non-movant's position is insufficient to withstand the summary judgment motion. Anderson, 477 U.S. at 252. Likewise, conclusory allegations or denials, without more, are insufficient to

preclude granting the summary judgment motion. Dash v. Mayweather, 731 F.3d 303, 311 (4th Cir. 2013). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." Anderson, 477 U.S. at 248. Further, Rule 56 provides, in pertinent part:

> A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:
> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

FED. R. CIV. P. 56(c)(1). Accordingly, when Rule 56(c) has shifted the burden of proof to the non-movant, the non-movant must show the existence of a factual dispute on every essential element of his claim.

### III. DISCUSSION

Section 1981 prohibits discrimination in employment based on race.[6] Nnadozie v. Genesis HealthCare Corp., 730 F. App'x 151, 156 (4th Cir. 2018). In cases like this one, where a litigant does not present direct evidence of discrimination, courts employ the McDonnell Douglas burden-shifting framework to § 1981 claims. Hawkins v. PepsiCo., Inc., 203 F.3d 274, 278 (4th Cir. 2000); McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). Under this framework, Plaintiff bears both the initial burden of establishing a prima facie case of

---

[6] Section 1981 provides: "All persons within the jurisdiction of the United States shall have the same right … to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens …." 42 U.S.C. § 1981(a).

discrimination, as well as the ultimate burden of proving intentional race-based discrimination. McDonnell Douglas Corp., 411 U.S. at 802-04; Hawkins, 203 F.3d at 278. For the reasons stated below, Plaintiff cannot make either required showing.

Section 1981 claims are evaluated under the same elements as applied to claims for race discrimination under Title VII of the Civil Rights Act of 1964, as amended ("Title VII"). Love-Lane v. Martin, 355 F.3d 766, 786 (4th Cir. 2004). In a typical discharge case, "[t]o advance a discrimination claim beyond the summary judgment stage under McDonnell Douglas, a plaintiff must put forth a prima facie case by showing that (1) 'he belongs to a protected class;' (2) 'he suffered an adverse employment action;' (3) 'at the time of the adverse action, he was performing his job at a level that met [his] employer's legitimate expectations;' and (4) the adverse employment action occurred under circumstances giving rise to an inference of unlawful discrimination."[7] Jones v. Constellation Energy Projects & Servs. Grp., Inc., 629 F. App'x 466, 468 (4th Cir. 2015) (citing Adams v. Trs. of the Univ. of N.C.–Wilmington, 640 F.3d 550, 558 (4th Cir. 2011)). When the adverse employment action results from a reduction in force, an employment discrimination plaintiff may satisfy the fourth element of the prima facie case by showing that the employer did not treat the protected characteristic neutrally when making its decision. Sweeney v. Marc Glob., Inc., No. 3:06CV182, 2008 WL 313618, at *9 (W.D.N.C. Feb. 4, 2008) (citing Causey v. Balog, 162 F.3d 795, 802 (4th Cir. 1998)). For the following

---

[7] The fourth element has also been formulated to examine whether the position remained open or was filled by similarly qualified applicants outside the protected class. McCallum v. Billy Graham Evangelistic Ass'n, No. 3:09CV381-RLV, 2012 WL 4756061, at *7 (W.D.N.C. Oct. 5, 2012) (citing Hill v. Lockheed Martin Logistics Mgmt., Inc., 354 F.3d 277, 285 (4th Cir. 2004)). Defendant argues that the undisputed evidence in this case is that Plaintiff's position did not remain open and Plaintiff was not replaced; thus, his prima facie case fails outright under this analysis.

11

reasons, this finds that Plaintiff has not set forth a prima facie case of race discrimination and Defendant is entitled to summary judgment.

First, the Court finds that Plaintiff has satisfied the first two elements of the prima facie case. That is, he is African-American, and was laid off from his job at Norton. As to the third element, although the undisputed evidence confirms that Mr. Dietrich rated Plaintiff a "C" before the workout session based on his assessment of Plaintiff's performance (with "C" being the lowest rating), for purposes of summary judgment only, the Court assumes Plaintiff was performing his job at a level that met Defendant's legitimate expectations.[8] Plaintiff fails, however, to meet the fourth prong of the prima facie case. That is, on summary judgment, Plaintiff has not shown that the adverse employment action occurred under circumstances giving rise to an inference of unlawful discrimination. Specifically, Plaintiff has presented no evidence to support a finding that Defendant did not treat race neutrally in this case or that his selection for the reduction in force occurred under circumstances where discrimination could be inferred.

As noted above, the undisputed material evidence demonstrates that the Norton business unit, along with other businesses in the Americas division, were directed to reduce costs, and that, around the same time, Norton had discovered an accounting error which further necessitated the need to engage in cost-saving measures. (Sejourne Decl. at ¶¶ 2, 5). Senior leadership therefore arranged for an offsite "workout session" to evaluate the organization holistically and to determine whether greater efficiencies could be achieved. (Id. at ¶¶ 6, 7). In advance of the

---

[8] As Defendant notes, although Mr. Dietrich assessed Plaintiff's and the other team members' performance to develop an initial "A," "B," or "C" rating, the decision to reduce an engineer at all resulted from a cost-savings measure and not because of any one engineer's performance. (Dietrich Decl. at ¶ 13). Thus, but-for the directive to reduce an engineer, Plaintiff would not have been terminated.

workout session, individual Norton managers responsible for salaried and factory indirect employees were directed to identify the projects/responsibilities of each team member and to rate each employee's performance as an "A," "B," or "C." (Id. at ¶ 7; Dietrich Decl. at ¶ 6). Consistent with this directive, Plaintiff's manager, Mr. Dietrich, rated each of his two teams, including the R&D team, which was composed of Plaintiff and five other engineers. (Dietrich Decl. at ¶¶ 3, 8). At the time, Mr. Dietrich did not know whether any of the employees he managed would be reduced and, if so, how many. (Id. at ¶ 11). After assessing each team members' performance, Mr. Dietrich determined that one engineer should receive an "A" rating, three engineers should receive "B" ratings, and two engineers should receive "C" ratings. Plaintiff and another engineer were the two engineers to receive "C" ratings. (Id. at ¶ 8). During the workout session, each manager presented their team members individually to the group of managers present. (Sejourne Decl. at ¶ 8). Mr. Dietrich presented his team members, including each member of the R&D team, providing their rating and the reasons therefore. (Dietrich Decl. at ¶ 11). At times, other managers provided input, including their own observations regarding a team member's performance or skills. (Sejourne Decl. at ¶ 8). In addition, throughout the day, workout leadership and the Norton managers had ongoing discussions regarding whether there were organizational redundancies and whether there were opportunities to consolidate and reduce waste within the departments. (Id.).

At the end of the day, and after presentation by each manager of their team members and discussion of potential organization redundancies, Mr. Sejourne, Mr. Roberts, and Mr. Millikan decided to reduce certain positions at Norton, including reducing one engineer from the R&D group reporting to Mr. Dietrich. (Sejourne Decl. at ¶ 9). The decision to eliminate a R&D engineer was based on their assessment of Norton's ability to meet current and anticipated future

13

business needs with one less engineer. (Id.).

As to whom to reduce, again, senior leadership asked Mr. Dietrich who could be eliminated from the R&D group with the least overall effect on the team. (Sejourne Decl. at ¶ 10; Dietrich Decl. at ¶ 12). In Mr. Dietrich's assessment, the laying off Plaintiff would have the least overall impact on the group. He determined that, while Plaintiff's current projects could be easily assumed by the remaining R&D engineers, Plaintiff could not easily and effectively assume the projects of the other team members. (Dietrich Decl. at ¶ 12). While one other engineer also received a "C" rating, that other engineer was handling electromechanical work, which Plaintiff has admitted he did not have the ability to perform. (Id.; Pl. Dep. 217:10 to 217:14). Not only did Mr. Dietrich consider the fact that the team had current projects that required electromechanical skill, but he also anticipated future projects requiring the same. (Dietrich Decl. at ¶ 12). Plaintiff's ultimate selection for reduction was based on review of outstanding projects, including their urgencies and intricacies, and how they could most effectively be absorbed by the team. (Id.). This decision, as is true for the workout session as a whole, was focused on how to create greater efficiencies and consolidation with the least impact to the business. (Sejourne Decl. at ¶ 10).

Notably, the foregoing facts are undisputed. Plaintiff conceded during his deposition that he does not know who selected him for the layoff, why he was selected, or even what process was used to select employees for separation. (Id. at 104:11 to 104:24, 115:1 to 115:4). Again, Plaintiff has not taken any depositions of Defendant's employees in this lawsuit, rendering the foregoing sworn testimony the sole record evidence as to the reduction process.

In sum, Plaintiff cannot show that Defendant failed to treat race neutrally or otherwise present any circumstances whatsoever giving rise to an inference of discrimination. In fact, such

an inference would be belied by the fact that the five other employees who were also laid off on February 10, 2014, were Caucasian.[9] (Sejourne Decl. at ¶ 12). Moreover, although other African-American employees at Norton were evaluated, they were not separated by the reduction at Norton affecting Plaintiff's employment. (Id.). Consequently, Plaintiff has not established a prima facie case of race discrimination.

The Court further finds that, even if Plaintiff could establish a prima facie case, Defendant has met its burden of production to articulate legitimate, non-discriminatory reasons for Plaintiff's selection in the layoff. See Holland v. Wash. Homes, Inc., 487 F.3d 208, 214 (4th Cir. 2007) (quoting Hill v. Lockheed Martin Logistics Mgmt., Inc., 354 F.3d 277, 284 (4th Cir. 2004) (explaining that, even if an employee presents a prima facie case, an employer will nevertheless prevail if the employer articulates 'a legitimate, nondiscriminatory reason for the adverse employment action," the employer's burden being one of production only and not persuasion).

Here, the decision to downsize at Norton for cost savings ultimately led to a reduction in force resulting in Plaintiff's separation. This decision to layoff an employee due to a reduction in force is legitimate and non-discriminatory. Indeed, "[t]he Fourth Circuit has commonly held, as have courts within its jurisdiction, that RIFs are legitimate, lawful reasons for terminating an employee." Propst, 148 F. Supp. 3d at 525 (citing White v. Dalton, 225 F.3d 656, at *1 (4th Cir. 2000) ("Defendant presented a legitimate, nondiscriminatory reason for his decision: a reduction-in-force necessitated by declining profits.").

---

[9] Defendant notes that, in addition, the current General Manager of the Monroe, North Carolina facility where Norton products are manufactured and in which Plaintiff worked is African-American. (Dietrich Decl. at ¶ 17). The General Manager position is the most senior management position at that facility. (Id.).

Plaintiff was included in the layoff because, as noted above, the decision makers determined—after evaluating organizational redundancies and efficiencies through a workout process—that one of six engineers from the R&D team should be eliminated. See id. at 526 (citation omitted) (discussing case law suggesting an employer must also offer a legitimate, non-discriminatory reason as to application of the reduction to a litigant). Plaintiff's manager was asked by senior leadership which of the six engineers on the R&D team could be eliminated with the least overall impact to the group. The manager concluded, based on an assessment of the relative urgencies and intricacies of the team's projects, that Plaintiff's assigned work could be most efficiently absorbed by the remaining team members, but that the reverse was not true (i.e., Plaintiff could not easily absorb work from other team members, including electromechanical work which he was unable to perform). As a result, Plaintiff was selected for the layoff. This is a legitimate, non-discriminatory basis for Plaintiff's selection and is supported by the undisputed evidence in this case. Given the foregoing, Defendant has satisfied its burden, which is "not onerous" and requires only articulation of "some legitimate, nondiscriminatory explanation which, if believed by a trier of fact, would support a finding that unlawful discrimination was not the cause of the employment act." Id. at 525 (citing Ennis v. Nat'l Ass'n of Bus. & Educ. Radio, Inc., 53 F.3d at 55, 58 (4th Cir. 1995)).

Finally, Plaintiff has not shown that Defendant's legitimate, non-discriminatory explanation is a pretext for race-based discrimination. To survive summary judgment, Plaintiff must prove by a preponderance of the evidence that the legitimate, non-discriminatory reason offered was not Defendant's true reason, but a pretext for discrimination. Reeves v. Sanderson Plumbing Prods., 530 U.S. 133, 143 (2000) (citations omitted). At this stage, Plaintiff's burden "merges with the ultimate burden of persuading the court that [he] has been the victim of

intentional discrimination." Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248, 256 (1981);

Here, as noted, Plaintiff has not responded to the summary judgment motion. Therefore, he has not produced any evidence of pretext. Furthermore, although he testified in his deposition regarding his skills, his own self-serving testimony regarding his personal assessment of his own work performance and skills is irrelevant and insufficient to create a genuine issue of material fact. Propst, 148 F. Supp. 3d at 535 (explaining that plaintiff's subjective evaluation is insufficient to create a genuine issue of material fact and is, in fact, "wholly irrelevant"). Instead, only the actual decision maker's perception is relevant. DeJarnette v. Corning Inc., 133 F.3d 293, 299 (4th Cir. 1998) (citing Evans, 80 F.3d at 960-61)).

Furthermore, as to Plaintiff's own unsupported speculation that race was considered in the decision to select him for the February 2014 layoff, such speculation is insufficient to establish a genuine issue of material fact as required to overcome Defendant's motion for summary judgment. The record on summary judgment simply contains no facts to support any finding that Defendant's legitimate, non-discriminatory explanation is pretext for race discrimination. Again, Plaintiff testified under oath that he never heard a single decision maker use any race-based discriminatory language, and he further conceded he cannot possibly know if Mr. Roberts, Mr. Sejourne, Mr. Millikan, or Mr. Dietrich harbor/harbored any race-based bias. (Pl. Dep. 49:13 to 50:25, 97:18 to 97:25, 231:17 to 231:24, 232:14 to 231:19). Moreover, all other individuals who were laid off during the February 10, 2014, layoff at Norton were Caucasian, and at least two African-American employees evaluated as part of the workout process at Norton were retained during that layoff. In sum, for these reasons, even if Plaintiff were able to prove a prime facie case of race discrimination, Defendant has provided a

legitimate, non-discriminatory reason for Plaintiff's layoff, and Plaintiff has not shown that the stated reason was pretextual.

## IV. CONCLUSION

For the reasons stated herein, Defendant is entitled to summary judgment.

**IT IS, THEREFORE, ORDERED** that:

1. Defendants' Motion for Summary Judgment, (Doc. No. 25), is **GRANTED**.

2. This action is dismissed with prejudice.

3. The Clerk is directed to terminate this action.

Signed: May 9, 2019

*[Signature]*

Max O. Cogburn Jr.
United States District Judge